**Philip AGEE, Plaintiff,**

v.

**Cyrus VANCE, Defendant.**

**Civ. A. No. 79–3491.**

United States District Court,
District of Columbia.

Jan. 28, 1980.

Melvin L. Wulf, Charles S. Sims, New York City, Allan Adler, Washington, D.C., for plaintiff.

Glenn V. Whitaker, Dept. of Justice, Washington, D.C., for defendant.

### MEMORANDUM AND ORDER

GESELL, District Judge.

This suit involves the validity of a passport regulation.

Agee, a United States citizen and former CIA employee, has for some years travelled abroad on a United States passport. During this period he has continued to write and speak extensively attacking United States intelligence efforts and has purported to reveal names of certain secret agents identified with the CIA. He now resides in West Germany. The Department of State, aware of Agee's activities and believing that they took on particular significance in light of the recent Iranian crisis and the general unrest in other areas, moved to revoke his passport.

On December 23, 1979, the Department notified Agee by letter that his passport was immediately revoked and should be surrendered. As grounds for this action, the Secretary of State ("Secretary") relied on the provisions of 22 C.F.R. §§ 51.70(b)(4)

and 51.71,[1] asserting specifically his conclusion that Agee's activities abroad "are causing or are likely to cause serious damage to the national security or the foreign policy of the United States." Agee was provided with a statement of reasons supporting the Department's determination,[2] and was informed of his right to an administrative appeal which was subsequently offered on an expedited basis.[3] He rejected this option, and instead by appropriate papers seeks declaratory and injunctive relief from the Court. Agee alleges that the revocation of his passport is invalid because it rests on a regulation which has not been authorized by Congress. In addition, he attacks the constitutionality of the regulation on its face, claiming that it conflicts impermissibly with rights guaranteed under the First and Fifth Amendments to the Constitution. The Court's jurisdiction is established. See 28 U.S.C. §§ 1331, 2201 et seq.

The matter is before the Court on cross-motions for summary judgment that have been fully briefed and argued on an accelerated schedule. In its current posture, the case presents a pure question of law since, for purposes of the motion, Agee concedes that his activities are causing and likely to cause serious damage to the national security or foreign policy of the United States.

The right to travel is constitutionally protected. *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). Citizens seeking to travel abroad face significant legal and practical deterrents if denied valid passports.[4] The Secretary of State's power to revoke or limit a passport flows from Congress not from the President. *See Kent v. Dulles, supra,* 357 U.S. at 129, 78 S.Ct. 1113; *Zemel v. Rusk, supra,* 381 U.S. at 7–13, 85 S.Ct. 1271. *See also Lynd v. Rusk,* 128 U.S.App.D.C. 399, 403, 389 F.2d 940, 944 (D.C.Cir.1967). His power is no greater than Congress may choose to delegate to him. Although he is authorized to act pursuant to 22 U.S.C. § 211a ("the Act"), this statute does not confer "unbridled discretion" to grant, revoke or otherwise restrict passports. Quite the contrary, the Supreme Court has instructed that when interpreting the nature and limits of the authority delegated over time by Congress such authority is to be narrowly construed. *Kent v. Dulles, supra,* 357 U.S. at 129, 78 S.Ct. 1113. Close attention is particularly warranted where, as here, the Secretary promulgated a rule enabling him to take action against

---

1. These regulations read as follows:
   22 C.F.R. § 51.70(b)(4):
   51.70 *Denial of passports*
   (b) A passport may be refused in any case in which:
   . . . (4) The Secretary determines that the national's activities abroad are causing or are likely to cause serious damage to the national security or the foreign policy of the United States. . . .
   22 C.F.R. § 51.71(a):
   51.71 *Revocation or Restriction of Passports*
   A passport may be revoked, restricted or limited where:
   (a) The national would not be entitled to issuance of a new passport under § 51.70. . . .

2. *See* Defendant's Exhibit A, Letter of December 23, 1979. The pertinent paragraph reads as follows:
   . . . The reasons for the Secretary's determination are, in summary, as follows: Since the early 1970's it has been your stated intention to conduct a continuous campaign to disrupt the intelligence operations of the United States. In carrying out that campaign you have travelled in various countries (including, among others, Mexico, the United Kingdom, Denmark, Jamaica, Cuba, and Germany), and your activities in those countries have caused serious damage to the national security and foreign policy of the United States. Your stated intention to continue such activities threatens additional damage of the same kind.

3. *See* Defendant's Exhibit B, Letter of December 28, 1979.

4. As a legal matter, a citizen must hold a valid passport in order to enter or depart from the United States. 8 U.S.C. § 1185(b). As a practical matter, travel between foreign countries without a passport is at best difficult. *See generally Zemel v. Rusk,* 381 U.S. 1, 14, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Lynd v. Rusk,* 128 U.S.App.D.C. 399, 403, 389 F.2d 940, 942 (D.C.Cir.1967). In this instance, the State Department has offered to waive the general requirement of 8 U.S.C. § 1185(b) and allow plaintiff to re-enter the United States.

the passport of a single individual. *See Zemel v. Rusk, supra,* 381 U.S. at 13, 85 S.Ct. 1271.

■ The Secretary can demonstrate that he has been given statutory authority in one of two ways. He must establish either that he acts pursuant to an explicit delegation or that he has followed "sufficiently substantial and consistent" administrative practice to warrant the implied approval of Congress. *Zemel v. Rusk, supra,* 381 U.S. at 12, 85 S.Ct. 1271. He attempts here, unsuccessfully, to meet both tests.

■ When the Secretary issued the challenged regulation in 1968, he relied on the Act. It is undisputed that this code provision does not expressly authorize the Secretary to deny or revoke a passport on national security grounds. No subsequent legislation relating to passports has expressly delegated such authority. Indeed, in 1958 during the administration of President Eisenhower the Department sought this precise authority and it was not granted by the Congress.[5]

The issue, therefore, is whether or not implied approval can be established. The Secretary urges that a long-standing historical practice involving passport denials based on national security and foreign policy interests exists, and that this historical practice, unquestioned by Congress, confirms the validity of the regulation. The Secretary adds that when Congress amended the Act in 1978[6] it assented *sub silentio* to the validity of the 1968 regulation.

Only on one prior occasion has a passport been revoked pursuant to 22 C.F.R. § 51.-70(b)(4). This solitary invocation over a 12-year period does not approach the level of substantial and consistent administrative practice. Indeed, until now the regulation has been virtually unused.

Defendant's main evidence for recognized prior practice is a series of statutes, regula-

tions, and advisory opinions dating back to 1861. Some of these materials assert executive authority to refuse passports to persons participating in criminal conduct. Others affirm the President's power to restrict or condition passport issuance in order to protect the interests of the nation during times of war or formally declared national emergency. *See, e. g.,* Pub.L. No. 65–154, 40 Stat. 559 (1918); Pub.L. No. 77–114, 55 Stat. 252 (1941). These powers were understood to be delegated to meet exigent circumstances for a limited purpose. *See, e. g.,* H.R.Rep. No. 485, 65th Cong., 2d Sess. 2 (1918). The congressional actions taken are not, however, persuasive on the issue of implicit authorization to invoke national security or foreign policy considerations in peacetime when no national emergency has been declared and no criminal conduct charged. While the Supreme Court in *Zemel* examined wartime as well as peacetime precedents, there was ample evidence of area travel restrictions being imposed under peacetime conditions. Comparable indications have not been produced regarding the imposition of passport controls to protect national security. Defendant's exclusive reliance on measures enacted or promulgated to address wartime or emergency conditions is inapposite.

At oral argument the Secretary pointed to State Department testimony during a series of congressional hearings covering passport legislation in 1957 and 1958. He argued that because the Department testified it already had the power it now asserts, and that legislation would serve as a mere clarification, Congress was effectively put on notice; its failure to reject this Executive interpretation is said to convey implicit approval.

This argument cannot withstand scrutiny. Expansive assertions made during the 1957 hearings must be read in light of *Kent v.*

---

5. *See* discussion at pp. 731–732 below.

6. *See* Pub.L. No. 95–426, § 124, 92 Stat. 971 (1978). The only change made was the addition of a final sentence, providing as follows:
   Unless authorized by law, a passport may not be designated as restricted for travel to

or for use in any country other than a country with which the United States is at war, where armed hostilities are in progress, or where there is imminent danger to the public health or the physical safety of United States travellers.

*Dulles,* which seriously limited the Secretary's power to deny passports in analogous circumstances under then-existing law. Immediately following the *Kent* decision, the Administration introduced a bill that would have given the Secretary the precise authority sought here.[7] But Congress failed to enact what was sought, and indeed several Senators expressed opposition or concern over the national security and foreign affairs provisions of the Administration bill.[8] Implied authority is not gained in this fashion.

Nor do the 1978 amendments constitute congressional assent by inaction. Legislative silence cannot be read as implicit adoption of an obscure, virtually unused regulation that limits the free exercise of protected rights. *See Lynd v. Rusk, supra,* 128 U.S.App.D.C. at 405–406, 389 F.2d at 946–47. This is particularly apparent where, as here, the action that Congress did take, *i. e.,* cutting back the Executive power over area travel restrictions conferred in *Zemel,* is hardly receptive to implying additional delegated authority. *See* Sen.Rep. No. 842, 95th Cong., 1st Sess. 14–15 (1978).

The Court is forced to conclude that the Secretary's promulgation of the challenged regulation was without authorization from Congress. It is unnecessary, therefore, to consider the additional attacks on the regulation based on the First and Fifth Amendments.

This holding in no way is intended to affect the President's authority to limit Agee's travel by other means. While it is obvious in the present crisis that the national security may be endangered when a former government official travels among foreign countries denouncing the United States' intelligence service and revealing the names of government agents, the precise problem presented is whether the regulation invoked was legally authorized. If Agee is indicted for any violation of law, his passport may be cancelled. If his activities are detrimental to the hostages in Iran, a special statute exists, 22 U.S.C. § 1732 (1976), which appears to give the President extraordinary authority to act. There may be other options. All that is held here is that because Congress has not acted to grant the Secretary authority, the regulation in issue cannot be upheld.

Plaintiff's motion for summary judgment is granted; defendant's cross-motion is denied. The regulation having been declared invalid, plaintiff's passport shall be restored.

SO ORDERED.

---

**7.** The Administration's bill, introduced as S. 4110, authorized the Secretary to deny passports to persons whose presence abroad would "seriously impair the conduct of the foreign relations of the United States" or "be inimical to the security of the United States." S. 4110, Sec. 103(6). *See* 104 Cong.Rec. 13046 (July 7, 1958) (Message from the President); *Passport Legislation: Hearings on S. 2770, S. 3998, S. 4110 and S. 4137 before the Senate Comm. on Foreign Relations,* 85th Cong., 2d Sess. 4 (1958).

**8.** *See, e. g., Hearings, supra* note 7 at 29–31 (Sen. Fulbright), 38–39 (Sen. Sparkman), 49–50 (Sen. Humphrey). Although the failure to enact legislation does not justify an inference of congressional disapproval, inaction under these circumstances can hardly be viewed as tacit support for the broad discretion claimed.